UNITED STATES POSTAL SERVICE

v.

PEAK LABORATORIES.

Civ. A. No. C75–144A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 19, 1975.

Richard A. Horder & Wm. D. Mallard, Jr., Asst. U. S. Attys., Atlanta, Ga., Lee H. Harter, U. S. Postal Service, Washington, D. C., for plaintiff.

Jack Paller, Atlanta, Ga., for defendant.

ORDER

EDENFIELD, Chief Judge.

One of the most difficult duties of a judge is sitting as sole juror in a non-

jury case, particularly where the whole case turns upon a naked credibility finding as between two expert witnesses of apparently equal credibility.

In this case, the Postal Service, pursuant to 39 U.S.C. § 3007, seeks a temporary injunction authorizing it to detain defendant's incoming mail until an administrative hearing can be held within the Department to determine whether the defendant's advertisements of its product, "FAT OFF", are false and misleading within the meaning of 39 U.S.C. § 3005. In its ads, the defendant claims in substance and effect:

A. That use of the product will cause a loss of fat;

B. That the effective cause of fat loss is the capsule and not caloric restriction (dieting) and/or caloric expenditure (exercising);

C. That the product will dissolve fat; e. g.,

THE FAT DISSOLVER

D. That the lecithin in the product, in the doses provided therein, will cause a decrease of 30% in the cholesterol level of the average person;

E. That the use of the product will cause fat to be redistributed.

In the affidavit of its medical expert from the Food and Drug Administration, filed by the Postal Service with its original complaint, the government's expert states categorically that each pound of excess weight in the human body represents an accumulation of 3500 "extra calories", which can only be removed by bringing about a caloric deficiency of 3500 calories; i. e., to lose one pound one must expend 3500 calories more than one ingests. He further says that such a caloric deficit can only be caused either by restricting the amount of calories ingested or by an increase in the expenditure of calories as by exercising. He concludes, "None of the ingredients in FAT OFF has any effect on the loss of weight tissue or fluid balances."

At the hearing on the grant of a temporary injunction the government further relied on the testimony of a doctor of pharmacology who is a teacher in the medical school of Emory University. This witness substantiates and amplifies the findings of the government's original expert. He discusses each of the substances contained in FAT OFF and concludes that only two of the ingredients, lecithin and pyridoxine (vitamin $B_6$), could conceivably affect any human being to any noticeable extent. Pyridoxine basically is iodine, or an iodide from which the iodine hormone is derived. This witness testifies that while the human body needs iodine, the average person, at least in this country, receives a complete and adequate supply of iodine from a normal diet and that, except in cases of abnormal patients under medical treatment, an iodine deficiency is extremely rare. With respect to lecithin he concludes that any need for this chemical in human nutrition has never been established and that, to the extent it may be needed, it can be synthesized (made) in the body itself from other items in the diet, although it can also be absorbed from an external source. He testifies further that lecithin, one of the drugs provided in FAT OFF, positively will not cause a decrease of 30% in the cholesterol level of the average person, as claimed by defendant, and further that with respect to some persons already having a low cholesterol level, a reduction of 30% in cholesterol, if it did occur, could cause a doctor to lose his patient. He concludes that, taken singly or in combination, the ingredients listed in FAT OFF simply will not produce the results claimed by the advertisements. Unfortunately, of course, this witness, as a pharmacologist, has never run a test on any human being in his life but only testifies based on tests made by others and reported in professional journals and other publications.

In response to this testimony, the defense first called a doctor of biochemistry who was also a medical student and instructor at North Texas State University. This witness testified that al-

though he was not as yet a licensed physician, he worked with physicians who were engaged primarily in treating coronary patients in a Texas hospital. He says that as a part of this treatment the attending physicians do use lecithin because it helps reduce fatty tissue in the blood vessels in and around the heart. Further than this, he really has no opinion.

The defense then called a general medical practitioner from a reasonably small Texas community whose training had run largely toward surgery. Without exaggerating, this witness might be described as the personified troubador of pyridoxine, or vitamin $B_6$. At some time in his career some fifteen years ago, he apparently met and formed a great admiration for the discoverer of vitamin $B_6$ in connection with patients displaying and complaining of puffy and inflexible fingers accompanied by tingling in the fingers and hands. His testimony was accompanied by numerous photographs and movie slides showing the hands of several of his patients "before" and "after" his treatment. He also expressed his opinion that anyone regularly taking vitamin $B_6$ in the quantities contained in FAT OFF could expect to lose at least five pounds. He did not claim, however, to have ever conducted any tests to substantiate this conclusion and he also gave his opinion that such conclusion would apply only to persons suffering from edema (swelling) accompanied by retention of fluid. So far as appeared, he had engaged in no tests involving defendant's product as a cure for obesity as such.

If the defendant's ads had made the claim that their product was useful in the medical treatment of coronary patients in the elimination of fatty tissue in the blood vessels around the heart, or if it had been advertised as a remedy for puffy, tingling, inflexible fingers, the case would be much more difficult to decide. As matters stand, however, the defendant's evidence simply never comes to grips or joins issue with the government's contentions. That is, none of the defendant's evidence (except the unsupported and untested opinion of the general practitioner witness) even tends to establish that FAT OFF or any of the ingredients in it will, without more, eliminate obesity, redistribute fat, or reduce body cholesterol by 30%. Such being the case, we have, on the basic question, only the testimony of the two government experts who, after rather thoroughly canvassing the fields of medical and pharmacological knowledge as reported in medical literature, positively testified that the defendant's claims are false or virtually impossible.

The temporary injunction sought by the government is therefore granted. Counsel may prepare an appropriate order.

Although there is evidence in the case that the possible effects of taking defendant's preparation may and would vary from person to person, depending on each person's individual body chemistry, the government here does not even claim, and the evidence certainly does not show, that the defendant's product is harmful in the general sense; that is, except perhaps in rare instances where a person suffering from Parkinson's disease is being administered another drug, L-Dopa; or, perhaps, where a person not under treatment unknowingly suffers from an extremely low cholesterol level. Such being the case, and this order being entered on temporary hearing and not after final trial, the defendant is entitled to and should be accorded an accelerated hearing in the administrative proceeding where this case will be finally tried.

It is so ordered.